FILED
2011 Jun-21 AM 10:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

FILED

2011 JUN 16  A 11: 53

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| Greg Barnett and | ) | |
| Renee J. Barnett | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No.: |
| EMC Mortgage Corporation | ) | |
| | ) | CV-11-K-2123-NE |
| and | ) | |
| | ) | |
| Nationstar Mortgage, LLC. | ) | |

## COMPLAINT

COME NOW Greg Barnett and Renee J. Barnett and for their Complaint state:

### Parties

1.     Plaintiffs Greg Barnett and Renee J. Barnett, husband and wife, are adult citizens of the State of Alabama residing in Morgan County, Alabama.

2.     Defendant EMC Mortgage Corporation ("EMC") is a foreign corporation whose principal place of business is 800 East State Highway, 121 Bypass, Lewisville, Texas 75067. EMC is qualified to do business in the State of Alabama, and, at all relevant times, was doing business in the State of Alabama and within the Northern District of Alabama.

3.     EMC is a debt collector within the meaning of Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.

4.     Defendant Nationstar Mortgage LLC ("Nationstar") is a foreign corporation whose principal place of business is 2728 North Harwood, Dallas, Texas 75201.  Nationstar is qualified to do business in the State of Alabama, and, at all relevant times, was doing business in the State of Alabama and within the Northern District of Alabama.

5.      Nationstar is a debt collector within the meaning of Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.

### Jurisdiction and Venue

6.      Jurisdiction is conferred upon this Court by 15 U.S.C. § 1692 and 28 U.S.C. §§ 1331, 1332 and 1367. Venue is proper in this Court pursuant to and 28 U.S.C. §§ 1391(a) and (c).

### Introduction

7.      In response to this country's extended foreclosure crisis, Congress passed the Emergency Economic Stabilization Act of 2008, and amended it with the American Recovery and Reinvestment Act of 2009 (collectively, the "Act"), 12 U.S.C. 5201 et. seq. The purpose to the Act is to restore liquidity and stability to the financial system in a manner that "protects home values" and preserves homeownership." 12 U.S.C. § 5201. The Act mandates that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use his authority over servicers to encourage them to take advantage of programs to "minimize foreclosures" of any assets acquired by the Secretary of the Treasury that are secured by residential real estate, 12 U.S.C. § 5219. Pursuant to the Act, on February 18, 2009 the Treasury Secretary and the Director of the Federal Housing Finance Authority announced the Making Home Affordable Program.

8.      The Making Home Affordable program consists of two sub-programs. The first sub-program concerns the creation of refinancing products for individuals with little or negative equity in their home and is now known as the Home Affordable Refinance Program, or HARP. The second sub-program concerns the creation and implementation of a uniform loan

2

modification protocol and is known as Home Affordable Modification Program, or HAMP. Under HAMP, the federal government provides incentives to participating loan servicers to modify existing mortgage loans for struggling homeowners in order to make their monthly payments more affordable and thereby reduce foreclosures.

9.     Loan servicers who elect to participate in HAMP ( a "Participating Servicer") must execute a Servicer Participation Agreement ("SPA") with the federal government.  Both EMC and Nationstar executed the SPA.  The SPA states that Participating Servicers "shall perform" the activities described in the program documentation "for all mortgage loans it services."  HAMP requires all participating servicers to evaluate all loans which are 60 days or more delinquent for HAMP modifications.  Additionally, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if a HAMP loan modification is appropriate.

10.     A HAMP modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a trial period plan ("TPP").  The TPP typically involves a three month period in which the homeowner makes reduced mortgage payments based upon a formula utilizing the financial information provided. If the homeowner makes all the TTP monthly payments, the second stage of the HAMP program is triggered, in which the homeowner is offered a permanent modification.

11.     Defendants routinely failed to offer permanent modification to homeowners in violation of the Servicer Participation Agreement and  TTP Agreements.

12.     Defendants EMC and Nationstar are in the business of servicing mortgage loans on behalf of lenders and investors, including "pooled" mortgage-backed securities investments.

3

This action seeks remedy for, among other things, the Defendants' false loan modification promises and their false loan modification programs, summarized as follows:

a). repeatedly failing to grant or implement loan modifications as promised, including misrepresenting the requirements for achieving permanent loan modifications and the status of pending loan modification applications;

b). requesting and accepting interim payments as a condition for promised permanent loan modifications under Trial Period Plans ("TPP") without reasonable basis to believe the loans would be permanently modified and without taking reasonable steps to implement modifications as promised and thereafter demanding payments as if the Trial Period Plans never existed;

c). systematically and consistently erecting artificial obstacles in the loan modification process (such as repeatedly "losing" borrower documents, rotating personnel assigned to files, altering modification requirements, delaying the modification process and then rejecting applications on the grounds that the documents were "stale" or outdated) with the intent of obstructing, delaying, or preventing permanent loan modifications;

d). misrepresenting amounts due, including misapplying payments or holding payments in suspense, resulting in improperly escalated debt, excessive interest and other charges;

e). instructing loan modifications to modify the amount of their payments purportedly as a prerequisite for a loan modification, while not honoring the modification, thus subjecting borrowers to foreclosure, the risk of foreclosure, late payment fees or penalties, illegal collection tactics and negative credit references on credit histories.

13.     The aforementioned practices have been described by the industry as "Extend and

4

Pretend."

**Statement of Facts Incorporated into Each Claim**

14.     On or about July 30, 2007 the Barnetts entered into a home loan mortgage transaction with Quicken Loans, Inc. The loan was a financial obligation for personal, family or household purposes and is a debt within the meaning of 15 U.S.C. § 1692 a(5). The note and mortgage were assigned to the "Maiden Lane Asset Backed Securities I Trust 2008-1." The right to service the loan was assigned to EMC.

15.     In or around February 2009, the Barnetts contacted EMC regarding a modification of their mortgage loan due to financial hardship. They were told by representatives at EMC that they must be at least two months' behind on their mortgage payments in order to receive assistance from the "Loan Workout Department."

16.     On April 7, 2009, the Barnetts contacted EMC to discuss a forbearance of their mortgage payments. The representative at EMC represented that the prior representative was wrong in stating to them in February that the Barnetts had to be at least two months' behind in payments. The representative then stated that EMC would need a "Letter of Explanation," the "EMC Borrower's Financial Statement," verification of income and last year's IRS tax filing. The Barnetts provided this information to EMC via a 49 page facsimile on April 7, 2009.

17.     Thereafter, EMC contacted the Barnetts regarding proof of insurance on the real property. The Barnetts sent proof of insurance to EMC on April 14, 2009.

18.     On April 28, 2009, EMC emailed Mr. Barnett and informed him that it had received the faxed modification package. The email also instructed the Barnetts to contact EMC to either: 1). set up a repayment plan or, or 2). pay the past due amount while the modification

5

application process was pending.

19.     On May 4, 2009, Mr. Barnett contacted EMC by email again, this time explaining that he was unable to make any payments and was unable to speak to anyone at EMC. Those representatives to whom he was able to speak, however, were unable to assist him.

20.     In or around early May 2009, EMC informed the Barnetts that they had been approved for a loan modification. In or around early May 2009, EMC sent to the Barnetts a Loan Modification Agreement to be signed and returned to it.

21.     After being notified of the approval, on May 13, 2009, EMC sent a Notice of Default letter to the Barnetts, demanding payment of the sum of $7,111.26 on or before June 17, 2009.

22.     On May 19, 2009, the Barnetts executed a "Home Affordable Modification Trial Period Plan." On May 27, 2009, the executed "Home Affordable Modification Trial Period Plan" and sent the first payment of $1,700.66 to EMC.

23.     Under the trial plan, the Barnetts were to make three consecutive payments of $1,700.66 on or before the 1st of June, July and August 2009.

24.     In a letter from EMC dated May 29, 2009, EMC enclosed trial payment coupons for the payment of $1,700.66 for each month of the trial modification period.

25.     The Barnetts made the three consecutive payments of $1,700.66 on May 27, 2009, June 29, 2009, and July 28, 2009.

26.     Despite EMC's failure to honor its commitment to the Barnett's and obligations under the "Home Affordable Modification Trial Period Plan," the Barnetts continued to send the $1,700.66 to EMC each month and EMC continued to accept said payments.

6

27.     Thereafter in 2010, EMC informed the Barnetts that additional information was needed to complete the loan modification process. This information was faxed to EMC on April 1, 2010 and again on April 17, 2010.

28.     On April 20, 2010, EMC sent another Notice of Default letter to the Barnetts, despite the Barnetts having made all required payments under the loan modification agreement. The Notice of Default letter also indicated that there was $1,074.93 being held in a "suspense" account.

29.     On April 29, 2010, the Barnetts contacted EMC regarding the Notice of Default letter. During this conversation, they were told that the modification that was previously in force was denied on February 21, 2010 and that their account had been transferred to an "underwriter."

30.     At no time did the Barnetts receive any oral or written notification as to why the modification had been terminated. In fact, their monthly billing statement dated March 31, 2010 still indicated that the modification was in full force and effect, contrary to what they had been told on the telephone on April 29, 2010.

31.     On April 29, 2010, the Barnetts faxed to EMC's underwriter, Sandra Vaughn, the information requested by her during their telephone conversation on the same day.

32.     On June 14, 2010, EMC wrote a letter to the Barnetts informing them that their mortgage loan was being sold and transferred to Nationstar Mortgage LLC.

33.     On September 7, 2010, a Nationstar Mortgage representative contacted the Barnetts and informed them that more information was needed for the modification application process, but that the process was still pending. This additional information was sent.

34.     The Barnetts continued to send updated paystubs and other information to

7

Nationstar for the next several months.

35.     On November 3, 2010, G. Moss & Associates, LLP sent the Barnetts a Notice of Default letter.

36.     On January 21, 2011, Nationstar sent the Barnetts another application for the Home Affordable Modification Program, even though the Barnetts had already sent this information.

37.     The Barnetts have sent all required information to Nationstar and to EMC.

38.     The Barnetts dispute the amounts due.  In a letter to the Barnetts dated May 26, 2011 from Sirote & Permutt PC, the total amount demanded of the Barnetts is $485,729.87.  In each of the billing statements sent to them from Nationstar, the principal balance never changed from $431,200.00, despite payments being made by the Barnetts.  The Barnetts also dispute the escrow balance and the arrearage on this loan because the Barnetts have maintained their own insurance, property taxes are approximately $1,600.00 per year, and no credits have been given to the arrearage or principal balance for the payments already made by the Barnetts since May 2009. The Barnetts allege upon information and belief, because the complete records of the application of their payments are not available to them but under the exclusive control of defendants and/or their agents, that the defendants have misapplied payments, failed to timely apply payments and otherwise breached their contract and duties with the Barnetts thus the Barnetts reserve the right to amend this complaint upon the completion of discovery.

## Count One
## Violation of the Fair Debt Collection Practice Act

39.     The Plaintiffs adopt the averments and allegations of the above paragraphs as if

8

fully set forth herein.

40.    The actions and omissions of the Defendants and their agents constitute numerous and multiple violations of the Fair Debt Collection Practices Act ("FDCPA").

41.    The Defendants engaged in collection activities and practices in violation of the Fair Debt Collection Practices Act (hereinafter referred to as FDCPA), 15 U.S.C. § 1692, *et seq.*, specifically, but not exclusively, in the following manner:

        (a)    The Defendants violated § 1692d by engaging in conduct the natural consequence of which was to harass, oppress, or abuse the Plaintiffs.

        (b)    The Defendants made false, deceptive and misleading representations concerning the character, amount and legal status of the debt in violation of § 1692e.

        (c)    The Defendants threatened to take action that could not legally be taken or which they did not intend to take in violation of § 1692e.

        (d)    The Defendants used false representations and deceptive means to collect or attempt to collect the alleged debt or to obtain information concerning Plaintiffs in violation of § 1692e.

        (e)    The Defendants have collected, attempted to collect, or otherwise assessed to the Plaintiffs' account amounts (including interest, fees, charges, or other expenses) which were incidental to the mortgage loan and which were not expressly authorized by the mortgage and note in violation of § 1692f.

        (f)    The Defendants have taken actions and are currently threatening to take

9

further action to effect the dispossession of the property from the Plaintiffs even though the Defendants do not own the real property pledged as collateral and do not have the legal authority to foreclose on said property, and, additionally, even if the Defendants could foreclose, there is no intent to take said real property because the Defendants are allowing the Plaintiffs to apply (yet again) for a modification in violation of § 1692f.

(g)     The Defendants and their agents or assigns have communicated with the Plaintiffs regarding the mortgage debt by use of a post card or similar paper in violation of § 1692f.

(h)     The Defendants failed to provide any notice or validation of debt or other initial communication to the Plaintiffs in violation of § 1692g.

(i)     The Defendants have sent Plaintiffs several modification applications the intent of which is to create the false belief in the Plaintiffs that such a person or company or other entity (other than the Defendants) is participating in the collection of or in an attempt to collect the mortgage debt, when in fact, such person or entity is not so participating in violation of § 1692.

42.     As a result of Defendants' violations of the FDCPA, Defendants are liable to the Plaintiffs for declaratory judgment that Defendants' conduct violated the Act, Plaintiffs' actual damages, statutory damages, court costs, and reasonable attorney's fees, pursuant to 15 U.S.C. § 1692k.

## Count Two
## Breach of Contract

43.    The Plaintiffs adopt the averments and allegations of the above paragraphs as if fully set forth herein.

44.    Plaintiffs entered into an agreement with EMC that provided for the modification of the terms of their mortgage loan.

45.    Plaintiffs also entered into a written agreement with both EMC and Nationstar which provided that the Defendants would process their applications for a loan modification(s).

46.    Plaintiffs have complied with all the conditions of the agreements.

47.    As a direct, proximate and foreseeable result of the Defendants' breaches, the Plaintiffs have been injured, including, but not limited to, suffering economic losses.

## Count Three
## Negligent & Wanton Hiring & Supervision

48.    The Plaintiffs adopt the averments and allegations of the above paragraphs as if fully set forth herein.

49.    Defendants negligently and/or wantonly hired, retained and supervised incompetent agents or employees who committed some or all of the wrongful acts set forth in this Complaint.

50.    Defendants knew or should have known of the conduct set forth herein which was directed at and visited upon the Plaintiffs by its agents and/or employees.

51.    As a result of the Defendants' actions, Defendants are liable to the Plaintiffs for compensatory and punitive damages, costs, and a reasonable attorney's fee.

11

## Count Four
### Negligence

52.     The Plaintiffs adopt the averments and allegations of the above paragraphs as if fully set forth herein.

53.     The Defendants have a duty to handle and process each modification application in a timely, orderly and professional manner.

54.     The Defendants also have a duty to handle, apply, and process payments in a timely, orderly, and professional manner and in accordance with the terms of the mortgage, note, and any modification agreements.

55.     The Defendants have breached their duties.

56.     As a direct result of the acts complained of, Plaintiffs have been caused to suffer, and will continue to suffer great mental anguish, economic and emotional damages and claim from the Defendants all damages allowable under the law.

## Count Five
### Wantonness

57.     The Plaintiffs adopt the averments and allegations of the above paragraphs as if fully set forth herein.

58.     The Defendants have a duty to handle and process each modification application in a timely, orderly and professional manner.

59.     The Defendants also have a duty to handle, apply, and process payments in a timely, orderly, and professional manner and in accordance with the terms of the mortgage, note, and any modification agreements.

60.     The Defendants have acted, and continue to act, intentionally or with a conscious

disregard of their duty reckless, with a knowledge of the circumstances and with a reckless

disregard of the probable consequences.

63.     The Defendants wantonly handled, applied, imposed, processed, created, and/or

serviced the payments made by the Plaintiffs, the documents and other information sent to the

Defendants as part of their modification application, the modification application, the permanent

modification, and other aspects of the Plaintiffs' loan and mortgage.

64.     These actions were taken with reckless indifference to the consequences,

consciously and intentionally in an effort to increase profits for the Defendants.

65.     The Defendants knew that these actions were likely to result in injury to the

Plaintiffs including financial and emotional injuries and mental anguish.

66.     As a direct result of the Defendants' wantonness, the Plaintiffs suffered financial

and emotional injuries and mental anguish.

67.     As a result thereof, the Defendants are liable for all natural, proximate and

consequential damages due to its wantonness as well as punitive damages.

## Count Six
## Fraud

68.     The Plaintiffs adopt the averments and allegations of the above paragraphs as if

fully set forth herein.

69.     The Defendants falsely represented to the Plaintiffs that they would receive a

permanent loan modification if the Plaintiffs timely made three monthly payments under the

Defendants trial period plan.  At the time Defendants made the representation Defendants knew

13

the representation was false.

70.     The Plaintiffs reasonably relied upon the representations made by Defendants, to their determent.

71.     As a proximate cause of Defendants' actions, Plaintiffs were injured, including but not limited to, suffering economic losses and mental pain and suffering.

## Prayer for Relief

WHEREFOR, Plaintiff respectfully prays that judgment be entered against Defendant as follows:

(a)     Actual damages in an amount determined by a jury;

(b)     Statutory damages in an amount provided for by law;

(c)     Punitive damages in an amount to be determined by the jury;

(d)     Costs, expenses, and reasonable attorney's fees;

(e)     An accounting of the monies paid by the Plaintiffs to Defendants and the true and correct amount owed on their mortgage account, including all debits, credits, costs, fees, and any other debit or credit;

(f)     An accounting of any suspense account which is related to the Plaintiffs' mortgage loan account;

(g)     An accounting of any escrow account which is related to the Plaintiffs' mortgage loan account;

(h)     A deceleration that Defendants, and their assignees, are estopped from claiming or collecting any payment of principal and interest in the amount in excess of that

14

provided for in the May 27, 2009 Home Affordable Modification Trial Period

Plan; and,

(i)     For such other and further relief as may be just and proper.


/s/ Lange Clark

Lange Clark
Attorney for the Plaintiffs
Law Office of Lange Clark, P.C.
301 19th Street North
Suite 550
Birmingham, AL 35203
(205) 939-3933
langeclark@mindspring.com


/s/ Robert C. Keller

Robert C. Keller
Attorney for the Plaintiffs
Russo, White & Keller, P.C.
315 Gadsden Highway, Suite D
Birmingham, AL 35235
(205) 833-2589
rjlawoff@bellsouth.net


**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY**

/s/ Lange Clark
Lange Clark

PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AS FOLLOWS:

EMC Mortgage Corporation
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, Al 36104

Nationstar Mortgage, LLC
c/o Lawyers Incorporating Service, Inc.
150 South Perry Street
Montgomery, Al 36104

provided for in the May 27, 2009 Home Affordable Modification Trial Period

Plan; and,

(i)     For such other and further relief as may be just and proper.

_____
Lange Clark

Attorneys for Plaintiffs:

Lange Clark
Attorney for the Plaintiffs
Law Office of Lange Clark, P.C.
301 19th Street North
Suite 550
Birmingham, AL 35203
(205) 939-3933
langeclark@mindspring.com


Robert C. Keller
Attorney for the Plaintiffs
Russo, White & Keller, P.C.
315 Gadsden Highway, Suite D
Birmingham, AL 35235
(205) 833-2589
rjlawoff@bellsouth.net


### PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY

_____
Lange Clark

15

PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AS FOLLOWS:

EMC Mortgage Corporation
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, Al 36104

Nationstar Mortgage, LLC
c/o Lawyers Incorporating Service, Inc.
150 South Perry Street
Montgomery, Al 36104